UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY HOLZHAUER,<br><br>Plaintiff,<br><br>v.<br><br>GOLDEN GATE BRIDGE HIGHWAY & TRANSPORTATION DISTRICT,<br><br>Defendant. | Case No. 13-cv-02862-JST<br><br>**ORDER 1) DENYING DISTRICT'S MOTION FOR SUMMARY JUDGMENT AND 2) DENYING RHOADES'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 51, 54 |

On February 16, 2013, a speedboat operated by Harry Holzhauer ("Decedent") collided with the Golden Gate Ferry. David Rhoades ("Rhoades"), the speedboat's owner, was also on board the boat at the time of the collision. Holzhauer was killed as a result of the accident and Rhoades suffered serious injuries. Plaintiff Mary Holzhauer ("Holzhauer"), acting individually and as the personal representative of her deceased husband, brought this action against Defendant Golden Gate Bridge, Highway, and Transportation District ("the District") and Rhoades. ECF No. 9. Rhoades asserted cross-claims against the District and a counter-claim against Holzhauer. ECF No. 30.

Currently before the Court is a motion for summary judgment filed by the District. ECF No. 54. Also before the Court is a motion for summary judgment filed by Rhoades against the claims asserted against him by Holzhauer. ECF No. 51.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## I. Background

### A. Factual Background[1]

On February 16, 2013, Decedent and Rhoades went on a boat ride in the San Francisco Bay on a Chaparral power boat owned by Rhoades. Rhoades Declaration, ECF No. 51-1. The weather was sunny and boat traffic was "normal." Id. at ¶ 10.

Decedent was operating the speedboat as the two returned to the vicinity of Rhoades's home. Rhoades states that he had seen Decedent operate his boat previously and that Decedent represented to Rhoades that he had previously owned and operated his own powerboat. Id. at ¶ 6-7. Rhoades states that Decedent appeared competent to operate the boat on the day of the collision and "knew and followed the rules of the road" prior to the collision. Id. at ¶¶ 6, 9. Holzhauer contends that Decedent's boating experience was not as extensive as alleged by Rhoades. Although Decedent had taken "a boating class, and joined a sailing club in the 1980s," he was less familiar with powerboats of the kind owned by Rhoades. ECF No. 60-3 at ¶ 3. Holzhauer's declaration admits that Decedent "bought a power boat" in the mid-1990s, but states the boat was "a slow cruising boat, not a speed boat" and "was rarely used." Id. at ¶ 4.

Prior to the collision, Rhoades' suggested that Decedent could "make a U-turn" to spend some more time on the water before returning to land. ECF No. 54-1 at 27. Although the actions immediately leading to the collision are unclear, the powerboat collided with the side of the Golden Gate Ferry. Rhoades was not paying attention to the boat's movements, but was viewing the San Francisco skyline immediately prior to the collision and therefore only saw the ferry for a "fraction of a second" before the speedboat collided with it. Id. at 32-33.

Alex Teitelbaum, a passenger on the ferry at the time of the collision, testified that he saw the powerboat was initially parallel to the ferry. Id. at 33. Teitelbaum saw the powerboat appear to turn right towards the ferry and that the powerboat appeared to accelerate. Id. at 28.

---

[1] The Court must draw all reasonable inferences in favor of the non-moving party for the purposes of resolving the motion for summary judgment. Johnson v. Rancho Santiago Cmt. Coll. Dist., 623 F.3d 1011, 1018 (9th Cir. 2010). Rhoades and Holzhauer are both non-moving parties for the purpose of the District's motion for summary judgment. Holzhauer is the non-moving party for the purpose of Rhoades' motion for summary judgment.

1  Teitelbaum states that, while the powerboat was approaching the ferry, the powerboat's operator
2  was looking over his left shoulder, away from the direction in which he was directing the
3  powerboat. Id.

### B. Jurisdiction

The Court has jurisdiction over these actions under 28 U.S.C. §§ 1331 and 1333.

### C. Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). A dispute is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, and material only if the disputed fact might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). The court must draw all reasonable inferences in the light most favorable to the non-moving party. Johnson, 623 F.3d at 1018. However, unsupported conjecture or conclusory statements do not create a genuine dispute as to material fact and will not defeat summary judgment. Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008).

### III. The District's Motion for Summary Judgment

The District argues that the speedboat was in violation of the Inland Navigational Rules ("the Rules") at the time of the collision and is therefore presumptively at fault.[2] The District says that the speedboat failed to post a proper lookout, in violation of Rule 5, 33 C.F.R. § 83.05, and failed to give way to the ferry, in violation of Rules 13 and 15. 33 C.F.R. §§ 83.13, 83.15.

Pointing to these alleged violations of the Rules, the District seeks to invoke the Pennsylvania Rule, which creates a rebuttable presumption that a party in violation of a rule of maritime law at the time of a collision was at least partially fault for that collision. The rule is named after the Supreme Court's decision in The Pennsylvania, 86 U.S. 125, 136 (1873), which

---

[2] "The Inland Navigational Rules Act of 1980, Pub. L. No. 96–591, which codified the INRs at 33 U.S.C. §§ 2001–2038, was repealed in 2010. The current rules subsequently were promulgated as Part 83 of Title 33 of the Code of Federal Regulations." Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C., 716 F.3d 886, 892 n. 7 (5th Cir. 2013).

held that when a ship "is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster." Therefore, "[i]n such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." Id.

Application of the Pennsylvania Rule is not dispositive. "Although application of the rule imposes a heavy burden of proof, that is all that it does. It does *not* determine a party's ultimate share of liability for a loss." Pennzoil Producing Co. v. Offshore Exp., Inc., 943 F.2d 1465, 1472 (5th Cir. 1991). Thus, the force of the Pennsylvania Rule has been lessened significantly by the Supreme Court's decision in United States v. Reliable Transfer, Inc., 421 U.S. 397 (1975), holding that maritime collisions are governed by the principle of comparative negligence. Id. at 411; see generally, George Rutherglen, Not with A Bang but A Whimper: Collisions, Comparative Fault, and the Rule of the Pennsylvania, 67 Tul. L. Rev. 733 (1993), cited approvingly in Fireman's Fund Ins. Companies v. Big Blue Fisheries, Inc., 143 F.3d 1172, 1176 n. 4 (9th Cir. 1998). Because comparative negligence allows for the allocation of liability between multiple parties to a collision, "any degree of fault which could affect an allocation of liability . . . preclude[s] summary judgment." Cliffs-Neddrill Turnkey Int'l-Oranjestad v. M/T Rich Duke, 947 F.2d 83, 87 (3d Cir. 1991).

Therefore, if Holzhauer and Rhoades can point to any genuine dispute regarding the District's partial liability for the collision, then summary judgment cannot be granted in favor of the District. This is true even if the facts suggest that the speedboat was significantly more at fault for the accident than the ferry.

The Third Circuit's decision in Cliffs-Neddrill illustrates this point effectively. There, the defendant vessel collided with the plaintiff ship, which was anchored at the time of the collision. The District Court had granted summary judgment in favor of plaintiff, due to maritime law's presumption that "a moving vessel which strikes a stationary vessel is at fault" and the uncontested fact that the defendant's ship had visually observed the plaintiff vessel seven miles prior to colliding with it. Cliffs-Neddrill, 947 F.2d at 86-87. The Third Circuit reversed,

1   concluding that, despite the defendant's violation of the rules of maritime law, the plaintiff boat
2   had also violated maritime rules by failing to display proper anchoring lights, post a lookout, or
3   use radar. Id. at 87-91. Thus, it was impossible to say at summary judgment that the plaintiff
4   boat's action "could not have been a cause of the accident," even though defendant's violations
5   suggested that defendant likely bore more responsibility for the collision. Id. at 91. The Third
6   Circuit cautioned that, in cases where both parties have violated maritime rules, summary
7   judgment is only available "in those cases in which [the moving party's own] violation of the
8   International Regulations cannot be said to have played *any* role in a collision or allision." Id. at
9   88 (emphasis added).

10   Holzhauer and Rhoades argue that, regardless of whether the speedboat was in violation of
11   the Rules at the time of the collision, the ferry was itself in violation of several Rules, including
12   Rule 5, which requires the posting of an adequate lookout at all times. 33 C.F.R. § 83.05. Rule 5
13   provides that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as
14   well as by all available means appropriate in the prevailing circumstances and conditions so as to
15   make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05. "[A]
16   lookout has a duty to look out and to report relevant and material observations to the person in
17   charge of navigation." Moran Towing & Transp. Co. v. City of New York, 620 F.2d 356, 358 (2d
18   Cir. 1980). ""If (the lookout) fails to see lights or vessels which proper watchfulness would have
19   disclosed, that fact 'unexplained, is conclusive evidence of a defective lookout' and his vessel is in
20   fault." Id. (quoting J. Griffin, The American Law of Collision § 112 (1949)).

21   The District argues that Rule 5 only requires a lookout to who can see "objects in front of
22   the moving vessel." ECF No. 65 at 2. But the District has not demonstrated that Rule 5 supports
23   such a bright-line standard, as the Rule clearly states that the adequacy of a lookout depends on the
24   "the prevailing circumstances and conditions" and what is needed "to make a full appraisal of the
25   situation and of the risk of collision." 33 C.F.R. § 83.05. "[T]he effectiveness of a lookout is an
26   issue which usually can be decided only after a full trial." Cliffs-Neddrill, 947 F.2d at 89. A
27   factfinder could conclude that a large ferry of the kind operated by the District requires more than
28   a lookout in the front of the vessel in order to make "a full appraisal of the situation and of the risk

United States District Court
Northern District of California

1  of collision."

2  Holzhauer and Rhoades have pointed to some facts which indicate that the ferry's lookout
3  was inadequate prior to the collision. The ferry's captain, Stacy W. Shonk, testified at deposition
4  that he would expect a crew member who saw a vessel that had a risk of colliding with the ferry to
5  inform him of that risk. ECF No. 61-2 at 100. Nonetheless, Captain Shonk testified he did not
6  become aware of the approaching powerboat until it had already collided with the ferry. Id. at
7  114. A factfinder could find that, in light of the captain's inability to make a full appraisal of the
8  situation and risk of collision, the ferry's lookout was inadequate. A factfinder could also find this
9  failure was a partial cause of the collision, as Captain Shonk testified that the ferry is capable of
10 taking action "to avoid collisions." ECF No. 61-2 at 99. A proper lookout could also have
11 enabled the ferry to sound a warning prior to the collision.

12 Therefore, a factfinder could conclude that, even if the powerboat was engaged in
13 numerous violations of the Rules at the time of the collision, the ferry was also in violation of the
14 Rules and may bear some responsibility for the accident. Therefore, the District's motion for
15 summary judgment is denied.

### III.   Rhoades's Motion for Summary Judgment

17 Holzhauer has also brought a claim against Rhoades, alleging that Rhoades' negligence
18 was partially at fault for the collision. Although Decedent was operating the vehicle at the time of
19 the collision, Holzhauer contends that Rhoades allowed Decedent to operate the speedboat in a
20 manner that created a material and unreasonable risk of collision, failed to warn decedent before
21 "taking the vessel into an area of extreme risk," and failed to post an effective lookout on the
22 vessel. ECF No. 9 at ¶ 11. Rhoades seeks summary judgment that he is not liable to Holzhauer.
23 ECF No. 51. Although Rhoades admits that he was not monitoring the boat's movements prior
24 the collision, he contends that he had no duty to serve as a lookout or warn Decedent of risk, as
25 Decedent was operating the boat at the time of the collision and Rhoades had reason to believe
26 Decedent was competent to operate the boat, given Decedent's prior boating experience.

27 Holzhauer alleges that Rhoades had a duty to ensure the boat was being operated safely,
28 including a duty under Rule 5 to serve as an independent lookout. Rhoades argues that he was a

6

mere passenger at the time of the collision and that the circumstances did not require a separate and independent lookout. As discussed above, Rule 5 provides that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05. Rhoades contends that, given the size of the powerboat, Decedent was capable of making "a full appraisal of the situation and the risk of collision" on behalf of the vessel and that Rhoades was therefore not required to post as an additional lookout. Rhoades asserts that Rule 5 cannot be read to require a small boat to post an independent lookout at all times in addition to the boat's operator, as such an interpretation would mean that no one could ever operate a small powerboat without another person on board, an absurd result.

"The adequacy of the lookout must be evaluated realistically in light of all the circumstances," and therefore can vary depending on the size of a boat. Capt'n Mark v. Sea Fever Corp., 692 F.2d 163, 166 (1st Cir. 1982). The First Circuit has held that Rule 5 does not require every boat to post a lookout "with no other duties," concluding that such an "onerous and unrealistic" requirement should not be imposed small boats, especially those with a limited number of people on board. Id.; see also Andrews v. United States, 801 F.2d 644, 650 (3d Cir. 1986) (holding that "[w]here the vessel involved is the size of the one here and there is nothing to block the operator's vision ahead of the boat, we perceive no basis for holding that someone in addition to the operator must be designated as a lookout.") The Court agrees that Rule 5 does not impose a duty for small boats to always have an independent lookout in addition to the boat's operator.

But even though small powerboats are not always required to have a person besides the operator on board to monitor the boat's movements, that conclusion alone does not resolve Rhoades' motion. The question remains whether a passenger who *does* happen to be on board a small powerboat owes any duty to the operator of that boat, especially where that passenger is also the boat's owner. "Courts have acknowledged that '[a]s a general rule, a passenger has no duty to keep a lookout on behalf of the operator of the vehicle.'" Weissman v. Boating Magazine, 946 F.2d 811, 814 (11th Cir. 1991) (quoting Dudley v. Whatley, 400 S.W.2d 773, 775 (Tex.Civ.App.

7

1966)). Nonetheless, there is an exception to this general rule in cases where a passenger "knows from past experience or from the manner in which the [vessel] is being [operated] on the particular trip, that the driver is likely to be inattentive or careless." Dudley, 400 S.W. 2d at 775. This duty is potentially heightened where the passenger is also the owner of the boat. "The rules of safe navigation, which apply to pleasure craft . . . impose[] a duty on [the boat's owner] . . . to see that a proper lookout [is] maintained from his boat at all times." Complaint of Interstate Towing Co., 717 F.2d 752, 755 (2d Cir. 1983). For instance, a boat's owner cannot turn control of his boat over to an intoxicated person or a small child lacking any boating experience and then claim that he had no duty to ensure his boat was being operated in a safe manner. The facts of the Second Circuit's Interstate Towing decision are instructive. There "an inexperienced pilot [was] placed at the helm at night with instructions to follow a set course by reference to a troublesome 'bouncing' compass." Id. The Second Circuit concluded that, in such a case, "the owner and master who sits idly by has not complied with the duty imposed upon him of keeping a proper lookout." Id.

    The parties dispute whether Rhoades had reason to know that Decedent was operating the boat in an inattentive or careless manner. While Rhoades states that he believed, based upon Decedent's representations, that Decedent had extensive experience operating boats of similar speed in similar conditions, Holzhauer claims that Decedent was inexperienced with "high speed watercraft and the San Francisco Bay." ECF No. 60 at 9. Because a factual dispute exists regarding Decedent's experience operating a speedboat in such conditions, a factfinder could conclude that Rhoades owed Decedent some duty to supervise the operation of the boat and to serve as a lookout prior to the collision. A jury could also find that the boat was being operated in such a reckless manner prior to the collision that Rhoades could not have reasonably believed that Decedent was operating the boat responsibly.

    A passenger may also owe a duty to keep a lookout in situations in which the boat is being operated jointly, and the passenger has maintained "active responsibility for and control over certain aspects of navigation of the boat." Weissman, 946 F.2d at 814. There exists a genuine dispute of material fact as to whether Rhoades was jointly operating the boat with Decedent at the time of the collision. Rhoades testified at deposition that he suggested that Decedent could make a

8

1 U-turn on the water immediately prior to the collision. ECF No. 54-1 at 27. Rhoades also
2 directed Holzhauer throughout the trip. See, e.g., ECF No. 60-2 at 14:20-21 ("I said we were
3 going to Point Richmond, and I pointed out an angle, a spot to go."). Rhoades also stated that he
4 would have told decedent to "slow down" if Decedent had been operated the boat at unacceptable
5 speeds during the trip. ECF No. 60-2 at 19. A factfinder could conclude that Holzhauer retained
6 an "active responsibility for and control over certain aspects of navigation of the boat," even while
7 Holzhauer was navigating, and thus had some responsibility to serve as a lookout. Weissman, 946
8 F.2d at 814.

9 Because there is a genuine dispute as to whether Rhoades owed Decedent a duty to serve
10 as a lookout or to ensure that the powerboat was being operated in a safe manner, the Court will
11 deny Rhoades's motion for summary judgment.

**IV.   Conclusion**

For the foregoing reasons, the District's motion for summary judgment, ECF No. 54, and Rhoades's motion for summary judgment, ECF No. 51, are both denied.

IT IS SO ORDERED.

Dated: February 12, 2015

_____
JON S. TIGAR
United States District Judge